UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


<u>Sky Systems of Plymouth, NH, LLC</u>

     **v.**                                     Case No. 12-cv-37-PB
                                                   Opinion No. 2012 DNH 145

<u>Sentech Architectural Systems, LLC</u>


**<u>MEMORANDUM AND ORDER</u>**

    Beginning in 2007, Sky Systems of Plymouth, NH, LLC ("Sky") served as an independent sales representative for the Texas-based Sentech Architectural Systems, LLC ("Sentech"), and was responsible for a sales territory encompassing various Northeastern states.  In January 2012, Sentech terminated its arrangement with Sky.  Claiming that it has not received all of the commissions to which it is entitled, Sky now brings suit against Sentech.  In addition to contract damages, Sky seeks treble damages and attorneys' fees based on Sentech's alleged violations of the Texas Sales Representative Act and its New Hampshire cognate.  Sky moves for summary judgment, and, for the reasons below, I deny its motion.

## I. <u>BACKGROUND</u>

Sky is a limited liability company based in New Hampshire. The company has no employees, and its president and sole member is Ernest Coupe. Sentech is a limited liability company whose principal place of business is Austin, Texas. Sentech designs structural glass systems, which have been incorporated into buildings such as the Freedom Tower in downtown Manhattan and the Newark International Airport.

In 2007, pursuant to an oral agreement, Sentech engaged Sky as an independent sales representative. Sky solicited orders for Sentech products and was compensated by Sentech through the payment of commissions. On August 16, 2010, Sky and Sentech formalized their arrangement by entering into a written Sales Representation Agreement ("Agreement"). Doc. No. 1-1. By the terms of the Agreement, Sky was granted the exclusive right to sell Sentech's products in a defined territory encompassing New England and northern New York State.

Clauses 5 and 6 of the Agreement address commissions and commission payments, specifying that commissions

> shall be computed on the gross amount of the invoice (including change orders) rendered by the Company and paid for by the Purchaser. In no event shall the

>     commission be computed on an amount in excess of the
>     amount received by the Company . . . .  The
>     Representative's commission shall be reduced a pro
>     rata amount[] when final settlement is made with a
>     Purchaser on other than a full payment basis . . . .

<u>Id.</u> ¶ 5.  As to timing, the Agreement specifies that commission payments "shall be made only after the Products are paid for by the Purchaser," <u>id.</u> ¶ 5, and "[a]ll payments of commissions shall be made within thirty days of receipt of payment by the Company," <u>id.</u> ¶ 6.

Termination is addressed by clauses 2 and 15.  Under the former, either party may terminate the Agreement "at any time without cause . . . upon 15 days' advance written notice to the other party[.]"  <u>Id.</u> ¶ 2.  Clause 15, whose meaning is disputed by the parties, is titled "Rights Upon Termination of This Agreement," and reads, in its entirety:

>     **Upon termination of this Agreement, the Company shall
>     pay the Representative commissions for orders and
>     contracts accepted by the Company prior to the
>     effective date of such termination, regardless of when
>     shipments are made or invoices tendered.**  Upon
>     termination of this Agreement, all trade names,
>     patents, designs, drawings, engineering or other data,
>     photographs, samples, literature, and sales data of
>     every kinds [sic], shall remain the property of the
>     Company, and the Representative shall return all such
>     property in its possession with reasonable promptness
>     along with copies of any confidential information
>     which it may have other than the regular exchange of
>     business correspondence.

Id. ¶ 15 (emphasis added).

On January 10, 2012, Sentech notified Sky that it would be terminating the Agreement. After receiving the notice, Sky demanded that Sentech make full payment of all outstanding commissions within fifteen days. Pointing to the most recent "Commission Statement" that had been supplied by Sentech, which listed nine projects for which commissions remained payable, Sky requested $73,968.60. That amount represents the sum total of the figures listed for each project under the "Remaining Commission Payable" heading of the Commission Statement.[1]

Sentech rejected Sky's demand. Instead, it continued to pay Sky commissions on a rolling basis as it received payment from its customers. Where projects listed on the Commission Statement were cancelled or where purchasers where unable to make payment, the commissions paid to Sky were withheld or reduced accordingly. Sky asserts that as of May 30, 2012, ongoing commission payments had reduced the outstanding balance owed from $73,968.60 to $65,031.29.

Invoking this court's diversity jurisdiction, Sky brought

---

[1] Sentech notes that to avoid any confusion going forward, it has changed its Commission Statements by inserting the word "Anticipated" into the "Total Commission Payable" and "Remaining Commission Payable" headings. Brown Aff. ¶ 5, Doc. No. 32-3.

suit on February 1, alleging that Sentech's failure to pay the full $73,968.60 by January 25 constituted a breach of the Agreement.  Sky's complaint (Doc. No. 43) contains nine counts, including a contract claim; two quasi-contract claims for unjust enrichment and quantum meruit; an unfair trade practice claim under New Hampshire law; and five claims arising out of the statutes governing sales representatives and commissions in Texas, New Hampshire, Massachusetts, New York, and Connecticut.  Sky now moves for summary judgment, but only addresses the contract claim and the claims under the New Hampshire and Texas Sales Representative Acts.

## II.   STANDARD OF REVIEW

A summary judgment motion should be granted when the record reveals "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The evidence submitted in support of the motion must be considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine issue of material fact.  Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

### III.  ANALYSIS

#### A.  Sales Representative Statute Claims

Sentech challenges the applicability of the Texas Sales Representative Act ("TSRA"), Tex. Bus. & Com. §§ 54.001-54.006, and the corresponding New Hampshire statute, N.H. Rev. Stat. Ann. § 339-E:1-6, on a number of grounds.  Among other things, Sentech argues that the statutes only cover arrangements where a wholesaler sells a product to a retailer for resale, and that neither its products nor its business model fit such a scheme.  I need not engage in that fairly complex and fact-intensive inquiry, however, because the statutes cannot cover the arrangement between Sentech and Sky for very simple reasons.

The TSRA applies only when a sales representative is engaged to solicit orders within the state of Texas.  PennWell

Corp. v. Ken Assoc., Inc., 123 S.W.3d 756, 769-70 (Tex. App. 2003) (holding that "[b]y the express terms of this provision [now § 54.002], the TSRA has no application to the sales representative relationship between Ken and PennWell because . . . . Ken was not authorized to, and did not, solicit orders within the state of Texas"); see Tex. Bus. & Com. § 54.002(a) ("A contract between a principal and a sales representative under which the sales representative is to solicit wholesale orders **within this state** must . . . ." (emphasis added)). Sky's sales territory did not include Texas, and therefore, Sentech cannot be liable under the Texas statute. Though Sky cursorily argues that the choice-of-law clause in the Agreement -- specifying that Texas law governs the Agreement's construction -- bears on the issue, that contract clause is irrelevant to whether a cause of action exists under the TSRA.

   Nor does the relevant New Hampshire statute apply to Sky and Sentech's relationship in light of the New Hampshire Supreme Court's holding that it only covers sales representatives who are natural persons. Addressing the legislature's use of the term "individual" to define a "sales representative," in contrast to its use of the traditionally broader term "person" to define a "principal," the court held that the legislature

7

intended to "limit[] 'sales representatives' to natural persons." John A. Cookson Co. v. N.H. Ball Bearings, Inc., 147 N.H. 352, 357-58 (2001). Sky is a limited liability corporation, not a natural person, and so it cannot claim the protection of the New Hampshire statute. Sky's attempts to factually distinguish its case from the underlying facts of Cookson are unavailing because the decision unambiguously sets out a generally applicable rule that is based on the court's construction of the statute.

**B.   Contract Claim**

The contract claim presents a somewhat more difficult question. The parties agree that the Agreement is to be interpreted according to Texas law in light of its choice-of-law clause. Doc. No. 1-1 at 4. Accordingly, I first set out the relevant principles of Texas contract law.

"The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indust., Inc., 907 S.W.2d 517, 520 (Tex. 1995). "To achieve this objective, [a court] must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will

be rendered meaningless." J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered in reference to the whole instrument." Id.

If a contract is "so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). If, however, there are "two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent." Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996). "For an ambiguity to exist, both interpretations must be **reasonable**." Id. (emphasis in original).

The disputed language in the Agreement is the first sentence of clause 15, which reads: "Upon termination of this Agreement, the Company shall pay the Representative commissions for orders and contracts accepted by the Company prior to the effective date of such termination, regardless of when shipments are made or invoices tendered." Doc. No. 1-1 ¶ 15. I begin my analysis by setting out each party's position on the meaning of

that sentence.

Sky contends that this sentence governs the timing of commission payments, and that Sentech was obligated, "upon termination of the agreement," id., to make a final payment to Sky in the amount of the outstanding commissions due.  Under this reading, clause 15 serves as an exception to the general timing rule.  That general rule, set out in clauses 5 and 6, is that commission payments must be made within 30 days of the purchaser's payment and "shall be made only after the Products are paid for by the Purchaser."  Id. ¶¶ 5, 6.  In the event of termination, however, Sky urges that clause 15 becomes effective and accelerates commission payments such that Sentech would immediately owe Sky commissions on all of its accepted contracts and orders, regardless of whether the purchaser of the order had yet made payment.

Reading the contract in this manner, the amount payable to Sky upon termination would be calculated by applying the appropriate commission multiplier (5% of sales under $1 million and 4.5% of sales over $1 million) not to the amount paid by the purchaser on the project, but to the anticipated total sales figure for each project.  See id. ¶ 5, ex. § III.  The amount would be independent of whether the project was subsequently

cancelled, whether the sales figure accurately represented the final sum a customer paid to Sentech, and even whether Sentech was ever paid at all for its work.

Sentech counters by arguing that clause 15 is not an exception to the general rule governing timing of payments, but acts only to establish that termination of the Agreement does not divest Sky of its entitlement to commission payments for orders and contracts accepted by Sentech prior to the termination.  Sentech reasons that because clause 15 uses the term "commission," it must incorporate the meaning of that term as set out in clause 5:  "Commissions shall be computed on the gross amount of the invoice . . . paid for by the Purchaser.  In no event shall the commission be computed on an amount in excess of the amount received by the company."  Id. ¶ 5.  Because commissions cannot be computed prior to a customer's payment, there simply is no commission due where the customer has yet to pay Sentech.  Under Sentech's reading, the benefit conferred on Sky by clause 15 is the right to commissions that accrue in the future, no matter if the date of shipment or the date an invoice is tendered is subsequent to the date of Sky's termination.

I conclude that Sentech's interpretation is the correct one.  Although clause 15, when viewed in isolation, might be

understood to govern the timing of commission payments due upon termination, when the clause is viewed in light of the entire Agreement, Sentech's interpretation is the only reasonable construction.

Clause 15 states that "the Company shall pay the representative commissions," but the clause itself does not define what constitute "commissions."  Therefore, to understand exactly what it is that shall be paid under clause 15, one must look to other provisions of the contract.  Clause 5, in conjunction with the commission schedule attached to the Agreement, define commissions and explain how they are computed.  Clause 5 explicitly defines a commission as a percentage of the amount paid to Sentech by a purchaser; indeed, the clause twice states that a commission only exists in relation to purchaser payments.  It first states that a commission is based on the "gross amount . . . paid for by the purchaser," and then reaffirms that "[i]n no event shall the commission be computed on an amount in excess of the amount received by the Company." Doc. No. 1-1, ¶ 5.

With the definition of "commission" so fixed by clause 5, it would be nonsensical to read clause 15 in the manner suggested by Sky.  That interpretation would require that

Sentech, immediately upon termination of the Agreement, make commission payments to Sky for those sales for which it has not yet received customer payment.  Under the clear language of clause 5, however, commissions can be calculated only as a function of purchaser payment.  Sentech cannot then pay Sky commissions based on customer payments not yet made, whether immediately upon termination or at any other time, because those commissions are not yet susceptible to calculation.[2]

The meaning of clause 15 urged by Sentech -- that in the event the Agreement is terminated, Sky maintains its right to receive commissions that accrue in the future -- must therefore be the correct interpretation.[3]  It is the only plausible interpretation of the provision that that can be harmonized with the explicit denotation of what constitutes a "commission" in

---

[2] Another way to look at it would be to say that where a purchaser has not yet rendered payment, the purchaser has paid $0.  Where a purchaser has paid $0, the commission due Sky is $0.

[3] Sky argues that Sentech's construction is inconsistent with standard canons of contract interpretation because it renders clause 15 meaningless.  Because the Agreement does not elsewhere indicate whether Sky retains the right to receive commissions when shipments are made or invoices are tendered after its termination, the argument is without merit.

clause 5.[4]  See J.M. Davidson, 128 S.W.3d at 229 (explaining the need to harmonize all of a contract's provisions).

In sum, the Agreement, when looked at as a whole, cannot support Sky's interpretation.  I conclude that the Agreement is unambiguous[5] insofar as it does not require that Sentech, immediately upon termination, pay to Sky the maximum possible commission that might accrue based on contracts and orders accepted by the termination date.

---

[4] Furthermore, this interpretation avoids certain absurd results that would have been possible if Sky terminated the Agreement. For example, if Sky solicited a particularly large sale on a project that it knew a purchaser was unlikely to be able to make full payment on, it could protect its anticipated commission by terminating the Agreement.  Because the Agreement does not distinguish between a termination initiated by Sky and a termination initiated by Sentech, Doc. No. 1-1 ¶¶ 2, 15, under Sky's reading of clause 15, termination would be a means to immediately receive the entirety of a commission that might otherwise never materialize.

[5] Because the Agreement is not ambiguous, I need not consult extrinsic evidence to discern its true meaning.  I would note, however, that neither party asserts that the Agreement is ambiguous, and neither party references the existence of any parol evidence that would bear on the meaning of the disputed provision in the event I was to find ambiguity.  Additionally, although there is an ongoing discovery dispute, neither party contends that resolution of the discovery issues would in any way bear on the question of contract interpretation addressed by this order.

## IV. **CONCLUSION**

The only reasonable interpretation of the disputed provision is the one urged by Sentech. Sky's motion for summary judgment (Doc. No. 25) is denied.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

August 27, 2012

cc: Seth W. Brewster, Esq.
    A. Robert Ruesch, Esq.
    James C. Wheat, Esq.